**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | |
| Debra Bond Estes, | ) | Case No.: 07-04648-BGC-7 |
| | ) | |
| Debtor. | ) | |
| | ) | |

| | | |
|---|---|---|
| Bettye Ann Anglin and | ) | |
| Forrest Anglin, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | A. P. No.: 07-00235-BGC-7 |
| | ) | |
| Debra Bond Estes, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

A trial was held on October 3, 2013. Appearing were: Ted Pearson, attorney for the Defendant, and the Plaintiffs and their attorneys Andre Toffel, James Walsh, and Michael Guarino. The Debtor-defendant, Mrs. Debra Estes, did not appear.

All matters were submitted on the record in this and related cases and proceedings, the May 6, 2013, deposition-trial testimony in this proceeding of Mrs. Debra Bond Estes (the debtor), the testimony in this proceeding of Mr. Robert Adams (the trustee's attorney), Mr. Charles Thomas (a claims superintendent for Cincinnati Insurance Company), Mrs. Bettye Ann Anglin (one of the Plaintiffs), and Mr. James Estes (the debtor-defendant's husband), and exhibits admitted in this proceeding.

### I. The Parties' Relationships

The parties had a long business relationship and have had an even longer litigation history.[1] This Court discussed both in detail in numerous documents over the

---

[1] Mrs. Anglin testified about the litigation history and identified 27 plaintiff exhibits which she stated was part of that history.

eleven years these parties have been before it.[2] In particular, the findings of fact in this Court's <u>Memorandum Opinion on Complaint and Objection to Discharge Pursuant to 11 U.S.C. §§ 523 and 727</u>, entered March 22, 2005, in Adversary Proceeding No. 02–00209, Docket No. 33, at pages 2 through 23 recite in detail the parties' 1997 initial business association, the operation of that business, the breakup of the business, and the aftermath. The findings of fact in this Court's <u>Memorandum Opinion and Order Denying Motion for Summary Judgment</u> entered March 24, 2009, in <u>Anglin v. Estes (In re Estes)</u>, 415 B.R. 568, (Bankr. N.D. Ala., 2009), explain in detail the parties litigation history to that point and explain in detail the 2002 through 2007 debts the plaintiff's contend are not dischargeable in the instant case. And finally, this Court's opinion in <u>Anglin v. Wallis (In re Wallis)</u>, A.P. No. 10–00010, 2011 WL 2357365 (Bankr. N.D. Ala. March 31, 2011) (a nondischargeability action against Kerri Lee Wallis, the daughter of Debbie B. Estes and stepdaughter of James Estes), summarizes both the business and the debt relationships of the parties and the parties' 2006 to 2009 litigation. The instant opinion explains the parties most recent litigation.

## II. The Debtors' Bankruptcy History

The debtors' bankruptcy histories are an important part of the instant litigation as some of the Court's rulings herein are based on that history as some of the discussions below will attest. In that context, all of the debtor's and her husband's cases and related adversary proceedings are summarized below.

In addition, that history is important for another reason. At the trial on October 3, 2013, Mr. James Estes, the debtor's husband, suggested that some of the information about prior cases or adversary proceedings in which he or his wife have participated, and which this Court had made findings of fact, might be incorrect. The Court assured Mr. Estes it would look into that issue.[3]

---

[2] The plaintiffs' filed their first action before the undersigned on August 30, 2002.

[3]     At trial, debtor's counsel question Mr. Estes about this issue:

| | |
|---|---|
| Pearson: | Okay. And has there been discussion on prior bankruptcies in these proceedings. |
| Estes: | Yes. |
| Pearson: | Okay. And how many bankruptcies have you filed? |
| Estes: | Two. |
| Pearson: | Okay. And how many bankruptcies has your wife filed? |
| Estes: | Counting this one, three. |
| Pearson: | Also, besides her being your wife, you're also power of attorney in her case. Right, that's why you're here? |
| Estes: | That's correct. |
| Pearson: | And when was your first bankruptcy? |
| Estes: | I think it was in 91, 90, 91, somewhere in there. |

2

| | |
|---|---|
| Pearson: | Okay. 92 maybe? |
| Estes: | Could be. |
| Pearson: | Okay. And was it joint bankruptcy? |
| Estes: | Yes. |
| Pearson: | And was there an advisory proceeding in that case? Adversary proceeding in that case? |
| Estes: | Yes. |
| Pearson: | And what was the outcome of that adversary proceeding? |
| Estes: | Debbie got a discharge and I got a discharge with the exception of two debts. |
| Pearson: | Two what? |
| Estes: | Two debts. |
| Pearson: | And when was the next bankruptcy filed? |
| Estes: | 02. |
| Pearson: | And was it a joint bankruptcy with your wife? |
| Estes: | Yes. |
| Pearson: | And what was the outcome of that case? If you could tell the court please. |
| Estes: | We were denied a discharge. |
| Pearson: | Was there another bankruptcy filed? |
| Estes: | Just this one. |
| Pearson: | And is this the current bankruptcy that we are here today talking about. |
| Estes: | Yes. |
| Pearson: | And you've heard all the testimony and everything. Judge Cohen and the trustee have mentioned another case. Is that you and your wife's also? |
| Estes: | No sir. That's a James C. Estes. |
| Pearson: | And that has nothing to do with you. |
| Estes: | No. |
| Judge: | Did I mention those bankruptcy cases? Or am I confused with? |
| Pearson: | I don't think it was today Judge. I think it was, when was that? |
| Estes: | It's been in some of the motions, Your Honor. That it was |
| Judge: | Do you have a number on that so I can check? |
| Pearson: | I can look it up. |
| Estes: | It's an, I think an 89 case. |
| Pearson: | Do you have any of the numbers? |
| Estes: | I don't think so. |
| Pearson: | I'll get that for you Your Honor. |
| Judge: | I would appreciate it certainly if I made a mistake in fact and confused Mr. Estes on another bankruptcy, well confused is not the word, but assigned another case to him, certainly I don't want to do that. |
| Pearson: | Yes sir. Is there some confusion about jewelry in this case? |
| Estes: | Appears to be. |
| Pearson: | The plaintiff in this case has brought some information out. How many Debbie Esteses do you think there are in Birmingham. |

3

In researching the issue, the Court found that some of the official records needed were paper and some were electronic. To obtain the paper records, the Court made a formal inquiry of the National Archives and Records Administration where those records are stored. The Court also reviewed the limited historic paper records maintained locally. The electronic records could, of course, be accessed easily. Based on all of those records, the Court believes that the following summary is an accurate history of the debtor's and Mr. Estes' bankruptcy histories.

## A.  Case No. 86-09530-RCF-7
## Filed by James C. Estes and Debbie Estes

Case No. 86-09530, filed on November 24, 1986, was a paper file. When the Court made a formal request of the National Archives and Records Administration to return the file from storage, the Center reported that the case file was outside of the time frame for maintaining paper files, and the file had been destroyed.

The Court's only alternative was to review the limited paper material maintained locally and the basic electronic entry created for the case when the current system's electronic predecessor was created. In doing so, the Court reviewed three separate, single-page documents.

One document is the Court's original docket sheet. That document shows that the case was filed by James C. Estes and Debbie Estes. The social security number listed for that Mr. Estes is not the one used by the current Mr. Estes in cases filed later and which he confirms as correct.  On that document, the same is true for the current Ms. Estes.

Another document the Court reviewed was the Court's original Bankruptcy Proceeding Docket, the document where individual matters would be entered by typewriter or rubber stamp. There are three entries on this docket sheet. Two relate to a motion for relief. The third notes the discharge of the trustee and the closing of the case. There is no indication that any adversary proceedings were filed.

The third document the Court reviewed was the electronic record for this case that was created sometime after the case was closed, and is the one available in the Court's current electronic system. This document disagrees with the first. While the

_____

| Estes: | By people search, there's 12. |
|---|---|
| Pearson: | So some of the information they have, kinda like that bankruptcy, has a name that is similar to yours, could be other people's property. |
| Estes: | That's correct. |

Unofficial Trial Transcript.

4

social security number listed on this document for James C. Estes is the same as the one on the Court's original docket sheet, (the one discussed first above), the social security number for the Debbie Estes filing case No. 86-09530 is the same as the one the current Debra Estes used when she filed the current case. In addition, she is listed on this most recent electronic document as "Debra Bonds Estes" as the joint debtor in the 1986, clearly the debtor's current name usage.

The Court cannot reconcile these conflicts. As such it cannot find that James C. Estes and Debbie Estes are the same individuals that filed the later cases which this Court has administered.[4]

**B. Case No. 89-09059-RCF-7**
**Filed by James Hansford Estes and Debbie B. Estes**

Case No. 89-09059, filed on July 21, 1989, was also a paper file, as were the three adversary proceedings filed in it.[5] The Court made the same request of the National Archives and Records Administration for these four files. While the Center did not respond that the main case file had been destroyed, the file could not be located. So, again, the Court relied on the limited paper maintained locally, although some of that paper appears to be printed from a database that must have been created after the case was closed. In contrast the three adversary proceeding paper files were available and located and were sent to the Court for its current review.[6]

---

[4] The Court's electronic case management system prior to the current one was called NIBS. Information from the Court's paper records about past and then pending cases was typed into NIBS manually. NIBS information was entered into the current CM-ECF system electronically. Common sense dictates that errors at either stage could have been made.

[5] This case was reassigned on July 19, 1989, with the number 89-09059-TBB-7.

[6] It appears that the main case, for which this Court does not have a file, was filed originally in the Northern District of Georgia, Northern Division. Proceeding No. 3 in Adversary Proceeding No. 89-0717, the third complaint filed in this 1989 case and discussed below, is an order by Judge Margaret H. Murphy, Bankruptcy Judge for the Northern District of Georgia. It reads in part:

> This matter is before the court as a result of an order entered July 19, 1989, which transferred venue of the above-referenced Chapter 7 case to the Bankruptcy Court for the Northern District of Alabama, Southern Division. The above-styled adversary proceeding was filed prior to the entry of that order.

Judge Murphy then ordered the adversary proceeding transferred also. The point is, apparently the 1989 bankruptcy petition filed by James Hansford Estes and Debbie B. Estes on August 24, 1989, was filed originally in the Northern District of Georgia and transferred to this Court on July 19, 1989.

In regard to the limited documents available locally for the main case, one document is the case matrix which is of no value in this inquiry.

Another document is the bankruptcy proceeding docket which is one of those that appears to have been printed from a data base on a dot matrix printer.[7] That document has 40 entries including numbers 13, 14, and 15 which indicate three different adversary proceedings were filed in this case. The document also includes docket number 38 indicating that the debtors received a discharge on June 12, 1990, and the case was closed nine days later on June 21, 1990.[8]

A third document is the electronic record for this case that was created sometime after the case was closed and is the one available in the Court's current electronic system.  That record includes the same social security numbers for James Hansford Estes and Debbie B. Estes as the social security numbers used when later cases, including the current one for Mrs. Estes, were filed.[9]

As stated above, the Court also requested the paper files for the three adversary proceedings filed in this case. Those files were available and located and were sent to the Court for review.[10]  Each adversary proceeding is discussed below.[11]

1. **Chicago Title Insurance Company v. Estes Brothers, Inc. and James H. Estes**, Adversary Proceeding No. 89-00696.

Chicago Title Insurance Company filed a <u>Complaint</u> against Estes Brothers, Inc. and James H. Estes, the husband of the debtor in the current case, in the United States District Court for the Northern District of Alabama on September 12, 1988. Case No. CV88-H-1526-S. After

---

[7] The heading on the document states that it was, "printed 06/22/90 at 10:44".

[8] Considering the above mentioned 1986 case as the current debtor's first case, this Court remarked in its March 31, 2011, Order in <u>Anglin v. Estes (In re Estes)</u>, Adversary Proceeding No. 07-00235, 2009 WL 3082623 at *2 (Bankr.N.D.Ala. September 10, 2009), that the debtor was not entitled to a discharge in this 1989 case because she had received a discharge within six years of the 1986 case. If the 1986 case was not the current debtor's case, as the Court now suspects, the discharge entered in 1989 would not be tainted.

[9] A fourth document with the heading, "Docket Number: 89-0905-RCF-7 Estes, James Hansford," includes AKAs for Debbie B. Estes as Debbie J. Bonds and Debbie B. Wallis.

[10] These files will be held at the Court and available for review until all matters are finally resolved at which time they will be returned to storage.

[11] There is no issue that the defendants named in these adversary proceedings are the current James H. Estes and Debra B. Estes.

6

making Findings of Fact and Conclusions of Law, that Court entered a default judgment against the defendants on February 14, 1989, for $176,410.53. CV88-H-1526-S, Docket Nos. 7 and 8, incorporated into AP 89-00696 Docket No. 1.

After the debtors filed Case No. 89-09059-RCF-7, Chicago Title Insurance Company filed an Objection to Discharge and Complaint to Except Debt from Discharge and for Judgment Thereon in this Court on August 16, 1989, against James H. Estes which became Adversary Proceeding No. 89-00696. AP Docket No. 1.

After a trial on November 14, 1989, U.S. Bankruptcy Judge Clifford Fulford entered a Final Order and Judgement on January 24, 1990, against James Hansford Estes, finding that the $176,410.53. judgment entered by the U.S. District Court was **nondischargeable** and excepted from discharge in Bankruptcy Case No. 89-09059. AP Docket No. 9.[12]

Judge Fulford did not address the plaintiff's objection to discharge for Mr. Estes.[13]

2.     **Claude H. Estes, III and Estes Realty Company v. James Hansford Estes**, Adversary Proceeding No. 89-00716.

This complaint, filed on August 28, 1989, alleged that the defendant breached his fiduciary duty to the plaintiffs and misappropriated company funds and that whatever debts he owed them should be nondischargeable.[14]

The proceeding was concluded by Order Granting Motion to Withdraw Complaint entered November 21, 1989, by Judge Clifford Fulford. Proceeding No. 9.

---

[12] While Mrs. Estes was a debtor in the 1989 case, she was not a defendant in the adversary proceeding.

[13] All documents reviewed are included in the adversary proceeding paper file retrieved from storage in Atlanta by this Court. That file will be retained by this Court until all current matters are finally resolved.

[14] The A.P. Number on the paper file is 89-0716, although the complaint is stamped with both 89-0716 and 89-0377A. Like the main case, this complaint was originally filed in the United States Bankruptcy Court for the Northern District of Georgia (Atlanta) and was transferred to this division. That may explain the different numbers.

7

The proceeding was closed on December 18, 1989.[15]

3. **First Alabama Bank v. James Hansford Estes and Debbie B. Estes**, Adversary Proceeding No. 89-00717.[16]

As noted above, this complaint was filed originally in the Northern District of Georgia but was transferred to this Court on August 23, 1989.[17] The plaintiffs filed an amended complaint in this Court on August 11, 1989.[18] This amended complaint first explained its connection with the adversary proceeding listed immediately above and what other debts the plaintiff contended it was owed by the debtors-defendants.

The complaint includes four counts including allegations of actual fraud in an extension of credit, actual fraud through check-kiting, larceny by fraud through check-kiting, and willful and malicious injury.

After a trial, the Court entered a <u>Final Order and Judgment</u> on January 24, 1990, against James Hansford Estes, and in favor of First Alabama Bank, for $486,702.72. The Court also found that the judgment was nondischargeable and excepted it from Mr. Estes' discharge.[19] Judgment

---

[15] All documents reviewed are included in the adversary proceeding paper file retrieved from storage in Atlanta by this Court. That file will be retained by this Court until all current matters are finally resolved.

[16] See Note 5 above. This proceeding was transferred to this Court from the Northern District of Georgia bankruptcy court on August 23, 1989.

[17] Like the above case, this adversary proceeding has two different numbers. The paper file is 89-0717. The complaint filed in Georgia is stamped with both that number and 89-0382A.

[18] This Court cannot now reconcile these date differences except to note that there is an August 23, 1989, letter from the plaintiff's attorney to the clerk of the Georgia court suggesting that the original complaint was filed on July 11, 1989, but that the file, although its motion to transfer venue was granted, had not arrived in Alabama.

[19] The Court entered its findings of fact orally on the record. Those facts apparently were taken, at least in part, from the Court's hand written notes officially stamped "Filed in Open Court" on January 12, 1990 as Proceeding No. 16 in the case file. Those notes discuss the Court's impressions of the debtor's deposition testimony and how that testimony related to the plaintiff's allegations.

8

was rendered in favor of defendant Debbie B. Estes and against First Alabama Bank.[20]

### C. Case No. 02-01867-BGC-7
### Filed by James H. Estes and Debbie B. Estes
### and Adversary Proceeding No. 02-00209-BGC

Commonly referred to by the parties in the current as the debtor's prior case, this case was filed on March 7, 2002.[21] The adversary proceeding was filed on August 30, 2002. This Court has written extensively in this case and its related adversary proceeding seeking the nondischargeability of certain debts and the denial of the debtors' discharge. Nothing additional would be helpful now except to note that this is the case in which the Court denied the debtors' discharge, in part because the debtors did not list the diamond necklace that is the subject of the instant matter.[22]

### D. Case No. 07-04648-BGC-7
### Filed by Debra Bonds Estes
### and Adversary Proceeding No. 07-00235-BGC

This is the debtor's current case. It was filed on October 15, 2007. The plaintiffs' pending adversary was filed on November 30, 2007.[23]

---

[20] All documents reviewed are included in the adversary proceeding paper file retrieved from storage in Atlanta by this Court. That file will be retained by this Court until all current matters are finally resolved.

[21] Case No. 02-01867-BGC-7 began as a paper file case. This Court began to migrate to electronic case management in February 2004. The debtors' petition in Case No. 02-01867 was filed before that time and is not available electronically. The Court refers to the entry number for any paper document with a "Proceeding No." Electronically available documents are referred to with a "Docket No." Because the case was ongoing when the Court's electronic system began, the paper file was never sent to storage and will not be until all current matters are finally resolved.

[22] See this Court's Memorandum Opinion on Complaint and Objection to Discharge Pursuant to 11 U.S.C. §§ 523 and 727, entered March 22, 2005, Adversary Proceeding No. 02–00209, Docket No. 33.

[23] This case began as an electronic file and will always remain one.

9

### III. Final Rulings on Four Interlocutory Orders
### Entered During the Final Phase
### of the Pending Adversary Proceeding

During the final phase of the pending Adversary Proceeding No. 07-00235, this Court entered four significant orders it believes were interlocutory.[24]  Consequently, each is reviewed below. Lest there be any question about their finality now, based on those reviews, the Order entered contemporaneously with this supporting Memorandum Opinion will assure that all four orders are final, appealable orders. The orders reviewed are:

1.      The Court's March 24, 2009, Memorandum Opinion and Order Denying the Plaintiffs' Motion for Summary Judgment, (A.P. Docket Nos. 30 and 31), denying the plaintiffs' Motion for Summary Judgment, (A.P. Docket No. 9);

On appeal, the U.S. District Court for the Northern District of Alabama found this order not to be final and appealable when entered on March 24, 2009.

2.      The Court's September 10, 2009, Order (A.P. Docket No. 42) denying the Anglins' Motion to Alter, Amend, or Vacate the Court's Order of March 25, 2009 [sic][25], A.P. Docket No. 35;

This order was inescapably connected with the Court's March 24, 2009, order denying the plaintiffs' motion for summary judgement. As such, it too could not have been a final, appealable order.

3.      The Court's March 5, 2012, Memorandum Opinion and Order (A.P. Docket Nos. 104 and 105) denying: (1) the defendant's Motion to Dismiss or in the Alternative Motion for Summary Judgment, Docket No. 34; (2) the Defendant's Renewed Motion to Dismiss or Grant Summary Judgment and Brief Defendant's Position on Court Meeting Scheduled for October 19, 2011, A.P. Docket No. 86, (a substitution for A.P. Docket No. 34);[26] and the defendant's Motion for Summary Judgment, A.P. Docket No. 92 ;[27]

---

[24] If an appellate court finds that any were not interlocutory, the original order of course would prevail.

[25] The order the Court was asked to reconsider was entered on **March 24**, 2009, not **March 25**, 2009, as the plaintiffs' motion states. See A.P. Docket No. 31.

[26] This motion replaced the defendant's Motion to Dismiss or in the Alternative Motion for Summary Judgment, Docket No. 34.

[27] This motion supplemented the Defendant's Renewed Motion to Dismiss or Grant Summary Judgment and Brief Defendant's Position on Court Meeting Scheduled for October 19, 2011,  Docket No. 86.

When the debtor filed her first motion to dismiss and motion for summary judgment on April 3, 2009, the primary support for that motion was the reasoning and holding from this Court's March 24, 2009, <u>Memorandum Opinion and Order Denying the Plaintiffs' Motion for Summary Judgment</u>, (A.P. Docket Nos. 30 and 31). Recognizing an imminent appeal, when this Court denied the <u>Anglins' Motion to Alter, Amend, or Vacate the Court's Order of March 25, 2009</u> on September 10, 2009, it specifically stated that the debtor's April 3, 2009, motion to dismiss and motion for summary judgment, "will be held for consideration pending final resolution of the Court's March 24, 2009, Order," and the Order denying the plaintiffs' motion for reconsideration. A.P. Docket No. 42.

An appeal <u>was</u> filed on September 18, 2009. During the 13 months the district court considered that appeal is when the debtor filed the additional two documents, No. 86 as a substitute for the original motion No. 34 and No. 92, a supplement to No. 86.

After the district court found that this Court's March 24, 2009, order was not a final, appealable order, this Court entered an order denying the debtor's motions to dismiss and motions for summary judgment. This Court wrote:

> The defendant relies on this Court's March 24, 2009, memorandum opinion denying the plaintiff's motion for summary judgment (Docket No. 30) and the Court's September 10, 2009, order denying the plaintiff's motion to alter the March order (Docket No. 42). In that regard in considering the plaintiffs' appeal, the district court wrote, "Nothing in the record before the court indicates that the bankruptcy court's Orders of March 24, 2009, or September 10, 2009, were final judgments." For that reason alone, this Court must deny the defendant's pending motion. If the orders were not final to be reviewed by the district court, this Court cannot find that they were final to decide the substantive matters the defendant seeks to be decided. Therefore, the <u>Defendant's Renewed Motion to Dismiss or Grant Summary Judgment and Brief Defendant's Position on Court Meeting Scheduled for October 19, 2011</u>, Docket No. 86 (and the related matters in Docket Nos. 34 and 92) are due to be denied.

<u>Memorandum Opinion</u> entered March 5, 2012, A.P. Docket No. 104, at 5.

Based on these procedural facts, this Court believes that its March 5, 2012, order denying the debtor's motions to dismiss and motions for summary judgment, because it was based on the district-court-described-interlocutory-

11

March 24, 2009, order, was also not a final, appealable order and, as such, has also been reviewed below.

4.    The Court's March 5, 2012, <u>Memorandum Opinion</u> and <u>Order</u> (A.P. Docket Nos. 104 and 105) granting the plaintiffs' <u>Motion to Amend Complaint</u>, A.P. Docket No. 95.

This order is not in the same category as the other three. It is not related to the March 24, 2009, interlocutory denial of the plaintiffs' motion for summary judgment. However, it should be treated similarly. As the discussion below demonstrates, as a general rule, motions to amend complaints are not final orders. This Court does not believe that this one is an exception to that rule. Therefore, this order too has been reviewed, and like the above-three, will be made final at the conclusion of the order stage of the present process.

**A. Review of Order Numbers 1 and 2**

**The Court's March 24, 2009,**
**Memorandum Opinion and Order**
**Denying the Plaintiffs' Motion for Summary Judgment**
**and**
**the Court's September 10, 2009, Order**
**Denying the Plaintiffs' Motion to Alter, Amend,**
**or Vacate the March 24, 2009, Order**

As discussed above, this Court denied the debtor a discharge in Case No. 02-01867, her third Chapter 7 case filed on March 7, 2002. As explained above, much of the activity in the current case, (the debtor's third or fourth Chapter 7 case), and its associated adversary proceeding, revolved around that ruling. The plaintiffs relied exclusively on that ruling in three of the matters they filed in the current case. Those were: (1) the original nondischargeability complaint they filed in the current case, A.P. Docket No. 1; (2) their later motion for summary judgment in that adversary proceeding, A.P. Docket No. 9; and (3) their motion to alter the eventual denial of that motion by this Court, A.P. Docket No. 35.

By way of history, after the debtor filed Case No. 02-01867, referred to by the parties and the Court as the debtor's "prior case," the plaintiffs filed a complaint on August 30, 2002, which lead to this Court's denial of the debtors' discharge in that Case No. 02-01867. A.P. No. 02-00209. In its March 22, 2005, order denying those discharges, the Court reasoned that while certain disputed debts owed by the debtor to the plaintiffs were dischargeable, there was reason to deny the debtors their discharges pursuant to section 727(a)(4)(A) of the Bankruptcy Code, 11 U.S.C. § 727(a)(4)(A). A.P. 02-00209, A.P. Docket No. 35.

12

The debtor filed the current case, Case No. 07-04648 on October 15, 2007, and the plaintiffs filed the pending adversary proceeding, A.P. No. 07-00235 on November 30, 2007. The sole count in that complaint was that two state court judgments entered in 2002 were nondischargeable under section 523(a)(10) of the Bankruptcy Code because the debts represented by those existed before the debtor filed Case No. 02-01867, the case in which this Court denied her discharge.

The pertinent part of section 523(a)(10) provides:

A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt –

that was or could have been listed or scheduled by the debtor in a prior case concerning the debtor under this title or under the Bankruptcy Act in which the debtor waived discharge, or was denied a discharge under section 727(a)(2), (3), (4), (5), (6), or (7) of this title, or under section 14c(1), (2), (3), (4), (6), or (7) of such Act;

11 U.S.C. § 523(a)(10).

In regard to the two state court judgments referenced by the plaintiffs in their complaint, as explained in this Court's other summaries of the parties' litigation, the two were: (1) one entered on April 10, 2002, in Civil Action CV 2001-1834 in favor of Bettye Ann Anglin for $1,000,000, and against the parties' one-time, common corporation; and (2) one entered on October 23, 2002, in Civil Action CV 2002-0820 in favor of Forrest Anglin for $1,000,000, and against the same corporation.[28]

The tether between the 2002 case and 2002 judgments and the current case is the state court's 2007 finding that the debtor was personally liable for the debts against the parties' common corporation.[29] It is in this regard that the Court's reasoning and the plaintiffs' original section 523(a)(10) arguments part.

On April 19, 2005, in the state court case Civil Action CV 2005-2348, the plaintiffs filed an action against the debtor seeking to hold the debtor personally responsible for the corporate judgments. Their one count in that state court complaint

───────────────

[28] In their arguments and briefs, the parties refer to a single $1,000,000 judgment, suggesting that the two state court actions may have been consolidated. The resolution of the legal issues here is not affected by whether there was one consolidated judgment or two separate judgments.

[29] As explained above, the details of the parties' business relationship and that relationship's connection with the contested debts is discussed in detail in the documents cited above.

alleged breach of contract, namely a breach of the parties' "Pre-suit Mediation Settlement Agreement."[30]

On August 16, 2007, the state court entered an order in CV 2005-2348 which: (1) found the debtor to be the alter ego of the corporation; (2) declared that the corporate veil should be pierced to permit imposition of personal liability on the debtor for debts of the corporation; and (3) declared the debtor to be personally liable for the judgments previously entered against the corporation in CV 2001-1834 and CV 2002-0820.

On October 15, 2007, the debtor filed the instant Chapter 7 case. As stated above, the plaintiffs filed the pending adversary proceeding, A.P. No. 07-00235 on November 30, 2007. Also as stated, and important to highlight again, the sole count in that complaint was that the two state court judgments entered by the state court in 2002, and in 2007 were not dischargeable in the current case pursuant to section 523(a)(10). The plaintiffs reasoned that because the 2002 corporate debts existed before the debtor filed Case No. 02-01867, the case in which this Court denied her discharge, those debts were not dischargeable pursuant to section 523(a)(10). The plaintiffs did not attribute any significance to the fact that the debtor's personal liability was determined after Case No. 02-01867 was filed.

On January 28, 2008, the Plaintiffs filed a Motion for Summary Judgment regarding the above argument. Docket No. 9.

On March 24, 2009, this Court entered its Memorandum Opinion and Order denying that motion. Docket Nos. 30 and 31.

This Court reasoned that until the debts owed by the corporation to the plaintiffs were reduced to judgment, the plaintiffs did not have any right, contingent or otherwise, to even pierce the corporate veil of the corporation, much less hold the debtor personally liable for the debts. Hence, the debtor's potential, personal liability for those debts did not come into being until the plaintiffs reduced them to judgments against the corporation, and then, and not before did the plaintiffs acquire a cause of action to pierce the corporate veil. Only then could they pursue the debtor personally for the purpose of collecting those judgments. Backus v. Watson, 619 So.2d at 1343-1345.

Consequently, this post-bankruptcy "piercing" judgment created a new and distinct obligation which did not come into existence until after the debtor filed her previous case. Therefore, the debtor's personal responsibility for those judgments did not exist prior to the date that she filed that previous case and did not come into being until after that case was filed.

---

[30] The plaintiffs' characterization of the cause of action as a breach of the Pre-suit Mediation Settlement Agreement is crucial to their arguments that this Court misunderstood the various causes of action heard by and decided by the state court.

Since the personal judgments rendered in favor of the plaintiffs in state court were not debts which the debtor could have listed or scheduled in her prior bankruptcy case, they were not nondischargeable pursuant to section 523(a)(10). Therefore, the plaintiffs' motion for summary judgment was, as a matter of law, due to be denied. The plaintiffs disagreed and on April 3, 2009, filed the <u>Anglins' Motion to Alter, Amend, or Vacate the Court's Order of March 25, 2009</u>.[31]  Docket No. 35.

At the May 6, 2009, argument on that motion, counsel for the movant remarked:

Judge, I think what you did in the order was essentially <u>chase rabbits</u>.[32] You chased after all the different judgments and the ways that we attacked Debbie Estes, and, and and and, we did.  They had some successes; we had some successes; but all of that is irrelevant. They had claimed a debt early on.  It's the same debt.  We finally got to them in a court where the judge held that that same debt was her debt and nothing changed.  All the judgments were $1 million except for that one small judgment against Jamie for $240,000.  It's the same debt court after court, child after child, entity after entity.  It is the exact same debt from day one, and Mr. Samsil is the one that agreed that that $1 million was the debt, and the judgment was entered accordingly.

***************************

I think where it got off track is when you said the piercing the corporate veil was a separate new cause of action.  It was not… You asked what facts are incorrect.  I think that's incorrect: that it was not a brand new cause of action that just came up. It's been the same cause of action from the very beginning, just having to go, you know, take side paths because the state courts, as Your Honor knows, they dismiss defendants without prejudice whenever somebody files bankruptcy.  So that's the reason why it looks like it may be different but it's really not.  It's the same thing, just having to go through Print Solutions' Chapter 11, the Esteses initial bankruptcy and now this bankruptcy.  But it's, the middle bankruptcy, their, Jamie and Debbie Estes' personal case, was here I think for three or four years and that's why there's been that delay.  But once, what, Your Honor

_____

[31] As noted above, the order which the plaintiffs ask the Court to reconsider was entered on March 24, 2009, not March 25, 2009.  See Docket No. 31.

[32] This, of course, would not be the first time someone took such an action that resulted in an unintended result. See Carroll, Lewis, <u>Alice's Adventures in Wonderland</u>, 1865, Project Gutenberg, The Millennium Fulcrum Edition 3.0, 2008, http://www.gutenberg.org/files/11/11-h/11-h.htm.

entered that order, that Mr. Walsh went back to the same cause of action against Mrs. Estes, got the judgment, and then she came back over here, that's where I think the facts in the order are not correct.

Unofficial Transcript of the May 6, 2009, hearing (footnote added).

The "rabbits" this Court chased led it to find that the state court's judgment regarding the debtor's personal liability for the judgments against the corporation was **based solely** on the plaintiffs' amended state court count, that is the count regarding the piercing of the corporation's veil. This Court found that the state court did not determine, declare, rule, or otherwise hold that the debtor personally breached the "Pre-suit Mediation Settlement Agreement." As support for that conclusion, the state court's <u>Final Order</u> reads, "A bench trial was held on the plaintiffs' <u>remaining claim</u> which seeks to impose personal liability on the defendant for the indebtedness of... [the corporation]." Exhibit 3 to <u>Anglin's Reply to Memorandum in Opposition to Motion for Summary Judgment</u>, A.P. No. 07-00235, Docket No. 26-7 (<u>Final Order</u> of the state court in CV 2005-2348) (emphasis added).[33]

Of course that distinction is important in any analysis of the application of section 523(a)(10), and all of it is discussed in detail in this Court's March 24, 2009, <u>Memorandum Opinion and Order Denying the Plaintiffs' Motion for Summary Judgment</u>. In particular, the Court noted the movants' primary disagreement with the Court's legal conclusions that:

---

[33] In its opinion, this Court added:

> There is additional support for this conclusion. The debtor asserts, based on the collateral estoppel effect of certain findings made by this Court in the debtor's prior case, that the state court disposed of the plaintiffs' breach of contract count prior to trial in a manner unfavorable to the plaintiffs. She argues, "Judge Vance allowed Defendant's motion to strike that count due to collateral estoppel." <u>Amended Memorandum in Opposition to Motion for Summary Judgment</u> at 2, A.P. No. 07-00235, Docket No. 28. Because the plaintiffs have not disputed that assertion, this Court presumes it to be true, especially since the final judgment in CV 2005-2348 reflects that the plaintiffs' count based on the debtor's alleged breach of the "Pre-suit Mediation Settlement Agreement" did not make it to the trial stage. So aside from the fact that the state court did not affirmatively determine that the debtor breached the "Pre-suit Mediation Settlement Agreement," its unfavorable disposition of the plaintiffs' count based on the alleged breach of that agreement establishes it was not breached by the debtor. Either way, it is clear that the debtor's liability to the plaintiffs does not stem from her breach of the "Pre-suit Mediation Settlement Agreement." Instead, it stems from the determination that she was the alter ego of the corporation.

<u>Memorandum Opinion</u> at 6, A.P. Docket No. 30.

Under Alabama law, a cause of action to pierce the corporate veil and impose liability on a shareholder for a debt owed by a corporation under an alter ego theory does not arise until a judgment holding the corporation liable for that debt has been rendered in favor of the person to whom it is owed. Backus v. Watson, 619 So.2d 1342, 1343 (Ala. 1993). It is not until then that a shareholder's potential liability for the corporation's debt could be assessed, or that whatever applicable statute of limitations for such liability would begin to run. Id. at 1344. The situation in the instant case is just the opposite. In the instant case, the debtor filed her prior bankruptcy case; then the plaintiffs obtained their judgments against the corporation; then they obtained their "corporate veil" judgment against the debtor.

Memorandum Opinion at 9, Docket No. 30 (emphasis in original).

On September 10, 2009, after again reviewing the history of the parties litigations, and after reviewing in detail its findings of fact and conclusions of law, this Court denied the Anglins' Motion to Alter, Amend, or Vacate the Court's order of March 25, 2009 Docket No. 42.

On September 18, 2009, the plaintiffs filed a Notice of Appeal (Docket No. 44) regarding: 1) the Court's March 24, 2009, Memorandum Opinion (Docket No. 30); 2) the Court's March 24, 2009, Order denying the plaintiffs' Motion for Summary Judgment (Docket No. 31); and 3) the Court's September 10, 2009, Order denying the Anglins' Motion to Alter, Amend, or Vacate the Court's order of March 25, 2009.

On October 1, 2010, the Honorable Sharon Blackburn, United States District Court Judge, Northern District of Alabama, dismissed the appeal explaining that this Court's orders were not final appealable orders.

In conclusion to the plaintiffs' section 523(a)(10) argument as raised again in its current posture, based on the above, and the Court's prior holdings, the Court again finds that the plaintiff's proposed section 523(a)(10) cause of action is due to be denied. When the Order entered contemporaneously with this Memorandum Opinion specifically denies the plaintiffs' section 523(a)(10) allegation, it will be a final, appealable order.

17

**B. Review of Order Number 3**

**The Court's March 5, 2012, <u>Memorandum Opinion</u> and <u>Order</u> denying:**
**(1) the defendant's <u>Motion to Dismiss</u>**
**or in the Alternative Motion for Summary Judgment;**
**(2) the <u>Defendant's Renewed Motion to Dismiss</u>**
**<u>or Grant Summary Judgment;</u>**
**and**
**(3) the defendant's <u>Motion for Summary Judgment</u>**

As discussed above, the debtor filed several motions to dismiss and motions for summary judgment, most in response to, or in reply to, the plaintiffs' motion for summary judgment. As quoted above, this Court initially denied all of those motions on this basis:

> The defendant relies on this Court's March 24, 2009,memorandum opinion denying the plaintiff's motion for summary judgment (Docket No. 30) and the Court's September 10, 2009, order denying the plaintiff's motion to alter the March order (Docket No. 42). In that regard in considering the plaintiffs' appeal, the district court wrote, " Nothing in the record before the court indicates that the bankruptcy court's Orders of March 24, 2009, or September 10, 2009, were final judgments." For that reason alone, this Court must deny the defendant's pending motion. If the orders were not final to be reviewed by the district court, this Court cannot find that they were final to decide the substantive matters the defendant seeks to be decided. Therefore, the <u>Defendant's Renewed Motion to Dismiss or Grant Summary Judgment and Brief Defendant's Position on Court Meeting Scheduled for October 19, 2011</u>, Docket No. 86 (and the related matters in Docket Nos. 34 and 92) are due to be denied.

The Court's March 5, 2012, <u>Memorandum Opinion</u> and <u>Order</u> (A.P. Docket Nos. 104 and 105).[34]

Based on the above, this Court finds, for purposes of the instant <u>Memorandum</u> and <u>Order</u>, that the debtor currently has **one** <u>Motion to Dismiss</u>, that is through A.P.

---

[34] Also as explained above, the Court denied all of the motions in total in one order. The reason was practical. In that opinion and order, the Court explained that the <u>Defendant's Renewed Motion to Dismiss or Grant Summary Judgment and Brief Defendant's Position on Court Meeting Scheduled for October 19, 2011</u>, filed on October 12, 2011, as A.P. Docket No. 86, **was a substitute for and replaced** the defendant's <u>Motion to Dismiss or in the Alternative Motion for Summary Judgment</u>, filed on April 3, 2009, as Docket No. 34. The debtor then filed her defendant's <u>Motion for Summary Judgment</u> on November 21, 2011, as A.P. Docket No. 92 **as a supplement** to Docket No. 86.

Docket No. 86, and **one** Motion for Summary Judgment, through A.P. Docket No. 86 supplemented by A.P. Docket No. 92, still pending before the Court.[35]

Because this Court initially denied those motions because of the district court's described procedural posture of the adversary proceeding, the Court must now revisit those rulings.

### 1. The Debtor's One Pending Motion to Dismiss

The debtor does not state any legal ground to support her motion to dismiss. As such the Court presumes it to be based on Rule 12(b)(6) of the Federal Rules of Civil Procedure.[36] The Court of Appeals for the Eleventh Circuit explained the standard to apply in this situation. The per curiam opinion in Stillwell v. Allstate Ins. Co., 663 F.3d 1329 (11th Cir.2011) explains, "To survive a 12(b)(6) motion to dismiss, 'a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." ' Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). This plausibility standard 'asks for more than a sheer possibility that a defendant has acted unlawfully.' Id." Id. at 1333.

Based on this Court's extensive knowledge of these parties' litigation, and specifically the most recent pending complaint and the debtor's oppositions to it, the Court finds that the plaintiffs met the standard stated above. The complaint contains, "sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." While this Court ultimately disagreed with the plaintiffs and ruled against them on their section 523(a)(10) argument, that is not support to dismiss the complaint before considering all of the legal and factual arguments. As the above demonstrates, the Court's analysis was long and detailed.

Consequently, in regard to the finality of the debtor's pending motion to dismiss, the Court finds that it is due to be denied and will be when the Order entered with this Memorandum Opinion is entered making that ruling final and appealable.

### 2. The Debtor's One Pending Motion for Summary Judgment

The Court need not review its denial of the debtor's motion for summary judgment any further than its review of its ruling above denying the plaintiff's section 523(a)(10) motion for summary. For the same reasons the Court denied the plaintiffs' motion, it finds that the debtor's motion should be granted.

---

[35] See this Court March 5, 2012, Memorandum. Those two matters are addressed separately in the Order accompanying this Memorandum.

[36] Rule 12(b)(6) of the Federal Rules of Civil Procedure applies here through Rule 7012 of the Federal Rules of Bankruptcy Procedure.

19

Consequently, in regard to the finality of the debtor's motion for summary judgment, the Court finds that as to the plaintiffs' section 523(a)(10) argument, the debtor's Motion for Summary Judgment (Docket No. 92) is due to be granted. The Order entered with this Memorandum Opinion will make that ruling final and appealable.

## C. Review of Order Number 4

### The Court's March 5, 2012, Memorandum Opinion and Order granting the plaintiffs' Motion to Amend Complaint

When this Court originally considered the plaintiffs' Motion to Amend Complaint to add a section 727(a)(2)(B) (11 U.S.C. § 727(a)(2)(B)) count, the Court wrote:

> "To establish a claim under § 727(a)(2)(B), a plaintiff must show that (1) there was a concealment, (2) after the filing of the petition, (3) of property of the estate, (4) by the debtor with the intent to hinder, delay, or defraud his creditors." In re Unger 333 B.R. 461, 470 (Bankr. M.D. Fla. 2005).

> The most practical question in considering any motion to amend a complaint is whether the motion is timely. That is the circumstance here. For all that has occurred in this and related cases, is it timely, and therefore proper for the Court, to allow the plaintiffs to amend a complaint that is over three years old?[37]

> The factual basis of the plaintiffs' section 727(a)(2)(B) count is as described by the Chapter 7 trustee assigned to this case. In his Response to Objection of Forrest and Bettye Ann Anglin to First and Final Application for Compensation for Attorney for the Trustee, he explained:

>> 11. After investigation, the Trustee discovered that the Debtor had at one time owned a diamond necklace which was not originally listed on the Debtor's schedules and which was alleged to hold considerable value.

>> 12. On or about March 30, 2007, in a deposition in a related state court case Mr. Estes testified that the aforementioned necklace was lost. This necklace was covered under an insurance policy issued by Cincinnati Insurance Company in the amount of $15,000.00. As a result, the Trustee filed an insurance claim with Cincinnati Insurance Company for $15,000.00.

---

[37] "The granting of a motion to amend is within the discretion of the court. Foman v. Davis, 371 U.S. 178 (1962)." In re Kyu Sup Mun, 458 B.R. 628, 630 (Bankr. N.D. Ga. 2011). See also Warner v. Alexander Grant & Co., 828 F.2d 1528, 1531 (11th Cir.1987).

13. Cincinnati Insurance Company subsequently contacted the Debtor's spouse or was contacted by the Debtor's spouse who stated that the claim should be withdrawn.

14. Consequentially, Cincinnati Insurance Company denied the insurance claim and notified the Trustee of the same.

15. In subsequent conversations and/or correspondence, Cincinnati Insurance Company gave additional reasons for denying the claim including that the Trustee did not have standing to bring the claim if the Debtor withdrew it and that there was no proof that the necklace had, in fact, been lost.

16. On February 2, 2010, HSY filed an Amended Motion to Approve Compromise with Cincinnati Insurance Company on behalf of the Trustee (the "Compromise") [Docket # 183]. The Compromise provided for the insurance claim to be settled for $7,500.00.

17. The Court issued a Notice of Hearing scheduling the Compromise for hearing and providing that objections to the Compromise be filed no later than March 24, 2010 [Docket # 184]. No objections were filed and the Compromise was approved by the Court on April 6, 2010 [Docket # 198].

Response to Objection of Forrest and Bettye Ann Anglin to First and Final Application for Compensation for Attorney for the Trustee at 3-4. Case Docket No. 241.[38]

The pending Chapter 7 case was filed on October 15, 2007. The plaintiff filed the pending complaint on November 30, 2007. But, as the above explains, the issue of the defendant's necklace was not resolved until at least two years after the pending case and adversary were filed. It may be that the plaintiffs should not have waited another two years to bring the action, but the Court cannot find that the complaint amendment is so untimely that it should be denied now. It is, of course, like all section 727(a)(2)(B) matters, by definition something that must have occurred after a case is filed.[39]

_____

[38] Note No. 7 to that Memorandum Opinion read, "It is of course the defendant's insurance claim which became a part of her bankruptcy estate, not the actual necklace."

[39] Note No. 8 to that Memorandum Opinion read, "But still, 'denial of discharge under section 727(a)(2)(B) requires the objecting party to... [prove] that defendant has concealed

21

<u>Memorandum Opinion</u> at 6-7, A.P. Docket No. 104.

Whether a plaintiff may amend a complaint is within the sound discretion of the Court. See Note 36 above. The Court continues to believe that the above reasoning and ruling to be correct and within its sound discretion; however, one question remains. Because this matter involves a bar date by which a nondischargeability complaint had to have been filed, this Court must also consider whether the amended complaint may relate back to, and satisfy, that bar date.

This Court has considered that issue in several unrelated cases.[40] It wrote in <u>GE Money Bank v. McGraw (In re McGraw)</u>, AP NO. 07-00016, 2007 WL 1076690 (Bankr. N.D. Ala. April 05, 2007):

### D. May the Plaintiff Amend Its Complaint?

The fourth, and final, argument is that the plaintiff did not "properly" file its complaint by February 5, 2007, the bar date for filing complaints to determine dischargeability of debts. The Court assumes the defendants are contending in this argument that the plaintiff may not now amend its complaint because the deadline for filing the original complaint has passed.

The issue then is where a 12(b)(6) motion is denied, may the plaintiff amend its complaint after the bar date has passed? The answer is yes.

Most courts agree on the general rule that amendments should be allowed freely. The court in <u>In re Tomczak</u>, Case No. 00–12096F, 2000 WL 33728176 (E.D.Pa., Jul 19, 2000) expressed it this way:

> ("[U]nless the facts alleged in the complaint clearly show that the plaintiff has no legitimate claim, courts ordinarily will allow the plaintiff leave to amend the complaint" if it is defective), federal courts will preclude a party from a hearing on the merits only in the strongest instances.

<u>Id</u>. at 1.

---

property of the estate after date of filing of the bankruptcy petition.' " <u>In re Nipper</u>, 186 B.R. 284, 288 (Bankr. M.D. Fla.1995).

[40] <u>Kaye v. Golden Flake Snack Foods, Inc. (In re BFW Liquidation, LLC)</u>, AP 11-00018, 2011 WL 6160754 (Bankr. N.D. Ala. September 26, 2011); <u>GE Money Bank v. McGraw (In re McGraw)</u>, AP NO. 07-00016, 2007 WL 1076690 (Bankr. N.D. Ala. April 05, 2007); <u>Estate of Elbie Chism v. Eldridge (In re Eldridge)</u>, 348 B.R. 834 (Bkrtcy. N.D. Ala. 2006); <u>In re Speir</u>, 190 B.R. 657 (Bankr. N.D. Ala. 1995).

But in the situation involving a deadline for filing a complaint, will the amendment relate back to the time of the filing of the original complaint? The answer is again yes. The court in In re Englander, 92 B.R. 425 (9th Cir. BAP1988) explains:

> Based on this standard, the Bankruptcy Appellate Panel has held that an amended complaint will relate back if "the specified conduct of the defendant, upon which the plaintiff is relying to enforce his amended claim is identifiable with the original claim." In re Dean, 11 B.R. 542, 545 (9th Cir.BAP 1981). In the instant case, the amended complaint is sufficiently identifiable with the original claim since the clear subject of both complaints is the dischargeability of specific loans.

> Furthermore, such a holding is most consistent with the Ninth Circuit's recognition that dismissal is a harsh penalty and lesser sanctions should be explored. See, e.g., Udom v. Fonseca, 846 F .2d 1236, 1238 (9th Cir.1988).

Id. at 428.

Rule 15(c) of the Federal Rules of Civil Procedure specifically allow such a result. Rule 15(c) reads:

> (c) An amendment of a pleading relates back to the date of the original pleading when—
> ...

> (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or....

Fed.R.Civ.P. 15(c).

Based on the facts alleged in the original complaint and those that may be alleged in an amended complaint, the Court finds for now that the amended allegations may relate back. If an amended complaint is filed, the defendants may, of course, contest any factual basis for such an amended complaint.

Id. at *6-*7 (footnote omitted).

This Court denied the debtor a discharge in case number 02-01867 in part on the debtor's failure to list a "diamond necklace" in that case. As the evidence presented

23

below establishes, there is direct evidence in the current case that the diamond necklace in case number 02-01867 is the same diamond necklace in the current case. Again, the necklace, or its equivalent insurance claim, was never listed in the debtor's current bankruptcy schedules.

The plaintiffs' current section 727 count is based on the debtor's failure to list the diamond necklace, or at least whatever insurance claims she had for that necklace based on her representation that the necklace was lost. Under Rule 15, "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading...." Id. As discussed below, the debtor's pattern of failing to list items in bankruptcy petitions, particular one or more diamond necklaces, certainly qualifies as something that, "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading...." Id.

Applying the above standards, this Court finds that the plaintiffs amendment to their complaint relates back to the bar date.

Therefore, based on the Court's earlier ruling, supported by the above, the Court finds that allowing the plaintiffs to amend their original complaint to include a section 727 count was proper. To the extent that the original ruling was not a final and appealable one, the Order entered with this Memorandum Opinion creates one.

## IV. Remaining Matter

The only matter remaining before the Court is the plaintiffs' section 727(a)(2)(B) count in their Amended Complaint; however, before making that ruling, the Court must clarify what is at issue.

The plaintiffs' Motion to Amend Complaint asked to add a count pursuant to section 727(a)(2)(B). 11 U.S.C. §727(a)(2)(B). That count related exclusively to the issue of whether the debtor owned a "diamond necklace" or had an insurance claims for that necklace before or after she filed the current Chapter 7 case but did not list that necklace or claim on her bankruptcy schedules. As explained above, the Court granted that motion and the plaintiffs filed an Amended Complaint with that count.[41]

The debtor did not dispute, and there is no evidence that she contends that she listed either the necklace or an insurance claim for the necklace on her bankruptcy schedules. To the contrary, the debtor admits she did not list either, but offers reasons

---

[41] After that motion was granted, the plaintiffs filed an Amended Complaint with two counts, specifically section 727(a)(2) and section 727(a)(4). Because the motion requested only section 727(a)(2)(B), and this Court approved section 727(a)(2)(B) only, it has not considered the section 727(a)(4) count.

for not doing so; however, whatever those reasons, the evidence proves without doubt that it was the insurance claim for the necklace that the debtor should have listed as she maintains that it was lost before she filed the current case.

The issue then is whether the plaintiffs proved that when the debtor did not list the insurance claim on her bankruptcy schedules, she violated section 727(a)(2)(B). The pertinent part of that section is:

(a) The court shall grant the debtor a discharge, unless--

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--

(B) property of the estate, after the date of the filing of the petition;

11 U.S.C. §727(a)(2)(B).

## A. Findings of Fact

Extensive evidence was offered by both parties regarding the diamond necklace and the insurance claim regarding that necklace. That included:

1. James H. Estes' deposition, taken December 5, 2007, Plaintiffs' Trial Exhibit 13.

The plaintiffs deposed Mr. Estes in the pending Chapter 7 case on December 5, 2007. In questioning by one of the plaintiffs' attorneys, Mr. Estes testified about jewelry he and his wife listed in response to a production request from the plaintiffs. One of the items listed was a diamond which Mr. Estes identified was a, "2 point 0 carat oval cut diamond." Deposition at 17, Line 19-20. He testified that the diamond was on a chain and something Ms. Estes wore everyday. Id. at 18-19, Line 9. He testified that the necklace was lost in March 2007, id. at 18, Line 14-18, and was covered by insurance. Id. at 20, Line 17-19. He did not file a claim for the insurance because he believed his homeowners insurance would be cancelled if he did. Id. at 20-21. He agreed that the necklace was insured for up to $15,000, id. at 22, Line 2-8, but that he paid about $1,800 or $1,900 for it. Id. at 18, Line 5-8.

2. Debra Estes' combination deposition and trial testimony taken on May 6, 2013, A.P. Docket No. 165.[42]

_____

[42] For various reasons which are not pertinent to any of the decisions in this case or adversary proceeding, the parties, with the Court's encouragement, took the debtor's testimony

25

Q.      Okay. Had you, at the time you filed either or both of your bankruptcies –
        well, let's start with the first one.
        At the time you filed your first bankruptcy petition, did you have a necklace
        with a large diamond on it?
A.      Yes.
Q.      And was it valued at approximately fifteen thousand dollars?
A.      I think so.
Q.      And did you list that in your first bankruptcy petition?
A.      I didn't list anything.
Q.      All right. At the time of your second bankruptcy petition, did you list that
        necklace?
A.      I didn't list anything. I never filled any of it out.
Q.      Now, had you seen appraisals for the diamond in your engagement ring
        and the diamond in the necklace?
A.      I probably did years ago.
Q.      All right. What happened to the necklace?
A.      I lost it.
Q.      All right. Well, tell the court how you came to lose it?
A.      I don't know. It just fell off of my neck.
Q.      All right. Do you know where you were?
A.      Well, I assumed, when I realized it was missing, I was at the mall but it
        could have been gone two or three weeks prior to that. I never took it off.
Q.      Did you wear it all of the time?
A.      Uh-huh.

        THE COURT: Did you say "yes," Ms. Estes?

        THE WITNESS: Yes. Yes, I am sorry.

        THE COURT: That's okay.

Q.      And you just failed to notice that it was not there?
A.      (No audible response.)
Q.      All right. At the time you noticed that that necklace was missing, what
        investigation did you make?
A.      I drove back to the mall and retraced my steps and I asked the security
        booth if anybody had turned it in. That is all I knew to do.
Q.      What mall did you go to?
A.      Galleria.
Q.      I am sorry?
A.      Galleria.

_____

(simultaneously as a deposition and as her trial testimony) on May 6, 2013, separately from the
main trial.

26

Q.      Okay. Did you make any report to the police?
A.      No.
Q.      Did you make any written report to the security people at the Galleria?
A.      No. I just asked.
Q.      All right. Did you make any further efforts to look for the diamond after you drove back to the Galleria?
A.      No, I didn't.
Q.      Did you discuss making a claim with – well, first, did you have homeowner's insurance at the time?
A.      Do we have homeowner's insurance?
Q.      Yes.
A.      Yes.
Q.      And had you listed that necklace with the homeowner's insurance?
A.      I am sure that my husband did but you will have to ask him that.
Q.      And did you decide to make a claim with the insurance company?
A.      I left it entirely up to my husband.

Trial Transcript, May 6, 2013, pages 18-20.

Q.      All right. Now, you know now that no claim was filed by your husband or by you for that missing diamond; is that correct?
A.      Well, by the transcript, there was a claim filed.
Q.      But I am talking about one that you filed or that your husband filed.
A.      I don't really know what you are talking about.
Q.      Okay. Did you file a claim with Cincinnati Insurance?
A.      I did not file a claim.
Q.      Did your husband file a claim with Cincinnati Insurance?
A.      No, he did not.
Q.      All right. Now, you know at some time the trustee attempted or did file a claim with Cincinnati Insurance Company for that missing diamond; correct?
A.      Uh-huh.
Q.      All right. And once that claim had been filed, did you and your husband discuss the fact that a claim had been filed by the insurance company?
A.      We didn't discuss it, no.
Q.      Did you make any efforts to talk to the insurance company, the Cincinnati Insurance Company, about that claim?
A.      No.
Q.      Were you present when your husband talked to Cincinnati Insurance Company about that claim?

Trial Transcript, May 6, 2013, pages 23-24.

Q.      One is the diamond that was in your engagement ring and one is the necklace that you lost?

27

|   |   |
|---|---|
| A. | Yes. |
| Q. | And at the time you filed the first bankruptcy, you owned both of these items? |
| A. | I think so. |
| Q. | And at the time you filed the second bankruptcy, you had lost the second item just prior to that? |
| A. | If that was the necklace, I had lost the second one. |
| Q. | Now, at the time that you filed your first bankruptcy, did you have any other significant jewelry? |
| A. | No. |
| Q. | At the time you filed your second bankruptcy, did you have any other significant jewelry? |
| A. | No. |

Trial Transcript, May 6, 2013, page 27.

3.      The Chapter 7 trustee's <u>Response to Objection of Forrest and Bettye Ann Anglin to First and Final Application for Compensation for Attorney for the Trustee</u> at 3-4, Case Docket No. 241, is quoted above. It explains the trustee's understanding of how he learned about the necklace and what actions he took.

4.      The trial testimony of the trustee's attorney Mr. Robert Adams' about the trustee's action once the trustee discovered the insurance claim asset. That testimony included:

Mr. Adams:      Well, what happened is that Mr. Reynolds filed a claim with Cincinnati Insurance for $15,000, and filled out the paperwork, you know, that, according to the debtors, that this necklace, which had been insured for $15,000 and there was an appraisal, as well, that attested its value at $15,000, had been lost.  So the adjuster, which certainly was his right, got in touch with the Anglins, to take a statement about it.

Mr. Toffel:      Do you mean the Esteses?

Mr. Adams:      Excuse me, excuse me, with the Esteses.  Thank you.  To take a statement from them, pursuant I'm sure to their rights under the policy, and were told by the Esteses that the claim should not be pursued, and they didn't want it pursued, and the insurance company got in touch with us and denied the claim.

Mr. Toffel:      Okay.  What did you do after they denied the claim?

Mr. Adams:      Well, we wrote them a letter and we explained to them that this was a different playing field now.  That the Esteses were in bankruptcy,

Case 07-04648-TOM7      Doc 288      Filed 03/06/14      Entered 03/06/14 13:41:53      Desc Main
Document      Page 28 of 46

and it wasn't their position about whether this claim was going to be filed or not, or whether it should be pursued. That the claim was property of the estate and we even cited section 541 to them. So then they came back and they did take up discussions with us. But then they threw up in our face the fact, why had no claim been filed, if in fact it had been lost. You're talking about a $15,000 necklace and it's lost or stolen and you don't file a claim. And equally important was the fact about whether we were even going to be able to prove. They had doubts about was it really lost or stolen. Just the whole circumstances of that. And so, we were looking at now, are we going to have to file another adversary proceeding against this insurance company. And so ultimately what we did on Mr. Reynolds' instructions was accept an offer for $7,500, which was half of the appraised value.

Unofficial Transcript.

5.    The trial testimony of Mr. Charles Edward Thomas, Jr., the Cincinnati Insurance Company Claims Superintendent assigned to review the claim filed for Ms. Estes' necklace.

While the Court notes that Mr. Thomas did not bring his working file with him to Court, Mr. Thomas had worked for Cincinnati for 27 years and appeared to be credible, and qualified to testify about the matters before the Court. Questioning began with the debtor's attorney Mr. Pearson, followed by cross examination and redirect. An unofficial transcription of the pertinent parts of Mr. Thomas' testimony follows:

Pearson:     Was Mr. Estes cooperative during this meeting?

Thomas:     Yes sir.

Pearson:     Okay. And did he answer all your questions.

Thomas:     Yes sir.

Pearson:     Did he ever advise you not to pay this claim?

Thomas:     No sir.

Pearson:     Okay. Did you later make an offer to Mr. Reynolds, the attorney for the Trustee?

Thomas:     I made it through Marvis Jenkins, I'm not sure of his exact title, but it was through Haskell Slaughter.

29

Pearson:     Okay now did they make the offer to you or did you make the offer to them?

Thomas:      I made the offer to them.

Pearson:     Okay. And did you know that Mr. or Ms. Estes did file this claim?

Thomas:      They did not.

Pearson:     And do you know why or what Mr. Estes in any way interfered with your investigation or subsequent payment of the claim?

Thomas:      He did not.

Pearson:     And did you need to interview Mr. Estes in order to investigate this claim?

Thomas:      I did.

Pearson:     Okay. So now this was something that you normally wouldn't do because it was lost prior to. I'm sorry, that's not relevant to your situation. So you worked it out with the trustee's office, with the attorney for the trustee, what you would settle on.

Thomas:      I did.

Pearson:     No further questions at this time Judge.

**********

Toffel:      When's the first time you had any discussion with or correspondence from the bankruptcy trustee?

Thomas:      That would be a letter from Marvis Jenkins. I want to say it was January 12, 2012. Somewhere around. I apologize. I don't have my file. Marvis Jenkins sent me a letter.

Judge:       Does Marvis Jenkins work at Haskell Slaughter?

Toffel:      He did at the time.

Judge:       Okay. It's not someone in Mr. Thomas' office.

Toffel:      No. He's an attorney. Marvis is an attorney with Haskell Slaughter, was with Haskell Slaughter. He now works for David Anderson.

Judge:      Okay, that's all I needed to know.

Toffel:     Do you remember the substance of Mr. Jenkins' letter to you?

Thomas:     Yes sir. He was putting Cincinnati Insurance Company on notice of a claim.

Toffel:     For $15,000 for this lost necklace?

Thomas:     Yes sir.

Toffel:     Okay. Was there anything attached to it, like an appraisal or deposition testimony?

Thomas:     I do have an appraisal in the file, but I'm not, I couldn't recall if the appraisal was attached to Mr. Jenkins letter or not. I believe I got that appraisal out of the, from the agency.

Toffel:     Was that the $15,000 appraisal?

Thomas:     To be honest with you sir, I, it was so dark it was hard to read. But there, from, there is an appraisal in the file for $15,000. But it's

Toffel:     Had you seen Mr. Estes' deposition testimony about that lost necklace and the appraisal and the insurance in effect?

Thomas:     No sir.

Toffel:     No one showed that to you at any time?

Thomas:     I was not aware of any of that.

Toffel:     So you had evidence. I'm sorry, strike that. The first time you heard from Mr. Jenkins was January 12 and then you interviewed, pursuant to that letter I take it, Mr. Estes on January 28?

Thomas:     I believe so. Yes sir.

Toffel:     Did you talk with anybody or otherwise deal with this claim in that 16 day period in between those two things?

Thomas:     I may have had a phone call or two with Mr. Jenkins.

Toffel:     Okay. And what was the substance of those phone calls?

31

| | |
|---|---|
| Thomas: | Basically, what he was doing, filing the claim. |
| Toffel: | Did you understand Mr., I'm sorry, that Mrs. Estes was in bankruptcy? |
| Thomas: | I did not until I received the initial letter from Mr. Jenkins. |
| Toffel: | Did you talk with the trustee, or Mr. Jenkins, before you spoke with Mr. Estes about the substance of the claim? |
| Thomas: | Again, the conversation was like the bankruptcy court was filing the claim. |
| Toffel: | Wasn't this a simple claim for a lost necklace with a value of $15,000? |
| Thomas: | Um, it was a claim that was being filed at a late date. Other than that, yes sir. |
| Toffel: | Was there an explanation to you as to why that claim was being filed late? By anybody? |
| Thomas: | It was made aware during the interview with Mr. Estes. |
| Toffel: | Which interview? The first one? |
| Thomas: | Yes sir. |
| Toffel: | The one that's Exhibit 10? |
| Thomas: | Yes sir. |

**********

| | |
|---|---|
| Toffel: | I'm going to show you Exhibit 15. |
| Thomas: | Yes sir. |
| Toffel: | And there is, excuse me, there are three paragraphs. I need you to read the top part on the first page where it's talking. It's an affidavit of Mr. Estes where he's talking about the claim. I'm going to get you to read through it and I'm going to ask you some questions. |
| Judge: | This is Plaintiff's Exhibit 16? |

32

Toffel:     15.

Judge:      15? But it's Plaintiff's?

Toffel:     Plaintiff's Exhibit 15 Your Honor.

Judge:      Okay.

Thomas:     I read the first paragraph.

Toffel:     The paragraph in the middle of the page.  "I went in his office and pulled out a claim form that would be used.  You also informed him that since there was no police report, and that they hadn't filed a claim in a timely manner, that it probably would be denied."  Did you tell him that?

Thomas:     I do not recall.

Toffel:     I'm sorry?

Thomas:     I do not recall.

Toffel:     Okay.  What about the next sentence?  "____ asked what I would do if I were them.  I assume he was just asking for my opinion.  Since it was no longer my claim, I told him I would deny the claim."  Did that conversation take place?

Thomas:     Not that I recall.

Toffel:     All of this was recorded and I can produce if need be.  Did you record that?  You don't think it took place, do you?

Thomas:     If it's not on these two pages.

Toffel:     It didn't happen did it?

Thomas:     I cannot say it did not happen.  I don't record

Toffel:     You would have recorded this had it happened wouldn't you?

Thomas:     I recorded his statement.  I didn't record the entire time frame that we were in the conference room.

Toffel:     Okay.  You initially denied the claim, didn't you?

33

| Thomas: | I did to the bankruptcy. |
|---|---|
| Toffel: | And then someone contacted you from the trustee's office and y'all worked it out. |
| Thomas: | Correct. |
| Toffel: | You don't recall what I just read to you in Mr. Estes' affidavit, you don't recall any of that do you? |
| Thomas: | No sir. |

**********

| Pearson: | Yes. Yes. Hey Mr. Thomas. Can you tell the Court did you ask Mr. Estes why he didn't file the claim? |
|---|---|
| Thomas: | Yes. Mr. Estes told me that he didn't want his insurance premiums to potentially go up. Plus the fact that he his credit wasn't the best, and that if for some reason his insurance was cancelled due to the claim, he said he would have a difficult procuring insurance from another carrier. |
| Pearson: | Right. He's lose not only on the personal property, but on his house. He had insurance on the house with you? |
| Thomas: | Correct. |
| Pearson: | And in fact after the, this claim was made, didn't he in fact lose his insurance? |
| Thomas: | I believe he did. |

**********

| Pearson: | Right. Right. Okay. So again, he cooperated through this whole thing at this time, his claim being paid to the trustee in bankruptcy court. |
|---|---|
| Thomas: | He had no problem. |
| Pearson: | And prior to this, you didn't know that Mr. Estes hadn't filed a claim for this case. |
| Thomas: | Had not. |

34

Pearson:     Until you heard from, initially back in 2009, 2008 and 2009?

Thomas:      First notice November 19th letter, 2008.

Pearson:     Thank you very much.

Thomas:      Yes sir.

**********

Toffel:      Mr. Thomas how many claims would you estimate you've handled since this one? Overall?

Thomas:      I average 275 a year.

Toffel:      Two hundred and seventy-five claims a year?

Thomas:      Yes sir. So that would

Toffel:      Don't you right things down and record them so you can remember them or they can refresh your recollection?

Thomas:      I have file notes that I put in the file.

Toffel:      Do you have any file notes that would support that affidavit of Mr. Estes that I showed you?

Thomas:      I have no files notes on my, at this time on me.

Toffel:      So, again, you said you just don't recall whether it happened or not, whether you asked him what his opinion of the claim was?

Thomas:      I don't recall asking that question.

Toffel:      You're not saying it didn't happen, you're just saying you don't remember it.

Thomas:      I don't recall.

Toffel:      And it's your testimony you have no file notes, you have no recordings, you don't have any memorandum regarding that whatsoever.

Thomas:      Not on my person.

Toffel:      That's all I have. Thank you.

35

Unofficial Transcript

6.    Transcriptions of two of the six or so conversations Mr. Thomas has with Mr. Estes which transcriptions were admitted into evidence as Defendant's Exhibits 10 and 10A and Plaintiff's Exhibits 11 and 12.[43]

7.    Mr. Estes' trial testimony relating to the diamond necklace.

Pearson:    And did you meet with Mr. Thomas, the insurance adjuster?

Estes:    I did.

Pearson:    And did he assist him?

Estes:    Yes I did.

Pearson:    I mean, did you assist him?

Estes:    I did.

Pearson:    Did you also meet with the trustee, Mr. Reynolds, about this insurance claim that you had with Cincinnati Insurance?

Estes:    I did.

Pearson:    Tell us what took place there.

Estes:    Mr. Reynolds asked me after a court hearing, I don't remember exactly when, to produce the insurance policy, a picture of the necklace, and the appraisal.

Pearson:    Did you do that?

Estes:    I did.  I took it to his office and he made copies of it and kept it.

                    *********

---

[43] Mr. Thomas testified that he recorded two of his conversations with Mr. Estes. Those conversations were in person interviews, and both were transcribed (some time later) by someone with Mr. Thomas' company. The dates on these documents are transcription dates. The date of the conversations was January 28, 2009.

36

Pearson:      Mr. Estes have you assisted your wife in the filing of this bankruptcy?

Estes:        I have.

Pearson:      Did you or your wife list everything that the both of you owned or had at that time?

Estes:        Yes sir.

Pearson:      The reason that you didn't file the necklace is because what had happened to it before?

Estes:        It was February or March of 07, I'm not real sure. She lost it. And we discussed it and we decided we were not gonna file a claim. Fear of losing our homeowner's insurance. I told Mr. Reynolds this. Mr. Reynolds said that's fine, he'll file it, it's not his problem.

Pearson:      So you, at that point, you cooperated with not only Mr. Reynolds, but the insurance agent and everybody else?

Estes:        Yes.

Pearson:      And then what was the result of, well, the result was that the claim was made, the offer was made, and it was paid to the trustee?

Estes:        That's my understanding.

**********

Pearson:      Yes sir. The reason you didn't list the insurance claim in the bankruptcy is because you hadn't filed an insurance claim. Is that correct?

Estes:        Didn't have the ring nor the insurance claim.

Pearson:      The necklace?

Estes:        Or necklace. Yes.

Pearson:      The necklace. And you hadn't made claim. That's why it wasn't listed on the bankruptcy.

Estes:        That's correct. It was not property that I owned or that Debbie owned.

37

\*\*\*\*\*\*\*\*\*\*

Toffel:      You knew at the time the bankruptcy was filed that the necklace
             was lost didn't you?

Estes:       Yes sir.

Toffel:      And you knew at the time that you filed this bankruptcy case that
             the necklace was insured didn't you?

Estes:       I really didn't think about it.  That insurance premium's paid through
             my homeowner's insurance.

Toffel:      But you didn't report the loss after the necklace was lost?

Estes:       No sir.

Toffel:      Did you read through all the questions or places in the bankruptcy
             petition to list assets.

Estes:       No sir.

Toffel:      You did not?

Estes:       I did not.

Toffel:      Did you sign your bankruptcy, did you sign the bankruptcy petition?

Estes:       My wife did.  It's her bankruptcy, not mine.

Toffel:      And you worked on it together, didn't you?

Estes:       Yes sir.

Toffel:      You didn't' see the portion that said to list all claims?  Did you see
             that in your petition?

Estes:       I can't recall.  I mean we didn't have it.  We weren't going to file the
             claim.  It wasn't an asset of the estate.

Toffel:      According to you.

Estes:       According to me and the attorney at the time.

38

| | |
|---|---|
| Toffel: | I don't have any further questions Your Honor. |
| Judge: | Mr. Pearson? |
| Pearson: | Just, Judge, just the fact that you didn't file that claim, you've already told the court why you didn't file it because the fact that you would, might lose your insurance. |
| Estes: | And in fact did. |
| Pearson: | And then did lose your Cincinnati Insurance after the claim was filed. |
| Estes: | That's correct. |
| Pearson: | That may have been a right decision, but once they filed it, you didn't mind and worked with them in every way to get that even though you knew you were probably still going to lose your insurance? |
| Estes: | That's correct. |

Unofficial Transcript.

## B. Summary of the Evidence in the Current Case

In regard to the plaintiffs' section 727(a)(2)(B) count, the above evidence establishes:

1. The necklace the debtor did not list in Case No. 02-01867-BGC-7 is the same necklace discussed in the current case;

2. This necklace was insured by the debtor for $15,000;

3. The debtor lost the necklace before she filed the current case;

4. Although the necklace was insured, the debtor did not file a claim for the necklace fearing that her homeowners insurance would be cancelled if she did;

5. Because the necklace was insured, the debtor had an insurance claim for the necklace at the time she filed her current case;

6. Although the debtor had an insurance claim for the necklace, she did not list that asset in her case;

39

7.      A claim for the necklace was eventually filed but denied by the insurance company;

8.      After negotiations between the insurance company and the Chapter 7 trustee, the insurance company paid the debtor's bankruptcy estate $7,500 as a claim for loss of the necklace.

### C. Conclusions of Law on the Plaintiffs' Section 727(a)(2)(B) Count

#### 1. Elements to Prevail under Section 727(a)(2)(B)

Helbling v. Holmes (In re Holmes), A.P. No. 08-01159, 2008 WL 6192253 (Bankr. N.D. Ohio, Dec. 3, 2008) is on point. In Holmes the debtor owned a fur coat when she filed a Chapter 7 bankruptcy but did not disclose it on her schedules. And even after the coat was stolen, and she did notify the police and her insurance carrier, she did not notify the trustee.

The court in Holmes explained the standard to apply considering whether section 727(a)(2)(B) has been violated. The court wrote:

> To prevail under § 727(a)(2)(B) the moving party must establish that, "(1) the debtor transferred or concealed property, (2) such property constituted property of the estate, (3) the transfer or concealment occurred after the filing of the bankruptcy petition, and (4) the transfer or concealment was made with the intent to defraud the bankruptcy trustee." Hunter v. Sowers (In re Sowers), 229 B.R. 151, 156 (Bankr .N.D. Ohio 1998); see also Keeney v. Smith (In re Keeney), 227 F.3d 679, 683 (6th Cir.2000) (creating an analogous two-part test for denial of discharge under § 727(a)(2)(A)). The minor differences between the four-part test in Sowers for actions under § 727(a)(2)(B) and the two-part test in Keeney for actions under § 727(a)(2)(A) stem from the additional requirements of § 727(a)(2)(B) that the disposition be (1) of "property of the estate" and (2) "after the date of the filing of the petition"— i.e., elements two and three of the four-part test in Sowers.

Id. at *3.[44]

This Court has applied these four elements to the current matter, and finds, as did the court in Holmes, that, "only the first and fourth elements require detailed discussion; the other two are clearly met." Id. at *3.

_____

[44] These elements are legally the same as those this Court applied from In re Unger 333 B.R. 461, 470 (Bankr. M.D. Fla. 2005) when it denied the debtor's discharge in her 2002 case.

40

### a. Elements 2 and 3 are Clearly Met

#### (1) Element 2

As to element 2 in the current case, no one contests that the insurance claim for the necklace was an asset of the debtor's bankruptcy estate.

#### (2) Element 3

As to element 3 in the current case, also no one contests that _if_ there was concealment of the asset, that the concealment occurred _after_ the bankruptcy was filed.[45]

### b. Discussion of Elements 1 and 4

What remains then is for the Court to determine whether the plaintiffs satisfied elements 1 and 4.

#### (1) Element 1 - Concealment

Numerous court have discussed the meaning of "concealment" for purposes of section 727. The opinion in Holmes included this summary:

> Courts have interpreted concealment under § 727(a)(2)(B) to mean "withholding knowledge of an asset by the failure or refusal to divulge owed information." See Sowers, 229 B.R. at 156; see also Heil, 383 B.R. at 654; Fourmigue v. Seeber (In re Seeber), 2005 Bankr.Lexis 2964, 7 (Bankr.E.D.La.2005); see also, United States v. Wagner, 382 F.3d 598, 609 (6th Cir.2004) (adopting broad definition of concealment in affirming defendant's conviction for fraudulently concealing property from a bankruptcy trustee in violation of 18 U.S.C. § 152). Courts have found that a solitary omission is sufficient. See Sowers, 229 B.R. at 157 (failing to disclose an asset at the meeting of creditors was sufficient to meet the concealment element).

Id. at *4. See also Buckeye Retirement Co., LLC, LTD. v. Swegan (In re Swegan), 383

---

[45] The current case was filed on October 15, 2007. As shown below, the first disclosure of the necklace was on December 5, 2007, after the case was filed. Thus the concealment the debtor is accused of occurred after the case was filed. And that disclosure was to the plaintiffs not the trustee. While the trustee presented evidence that Mr. Estes gave a deposition in March 2007 at which Mr. Estes testified that the necklace was lost, the trustee was mistaken and had confused two dates. The deposition was in December 2007, but Mr. Estes did testify that the necklace was lost in March 2007.

Case 07-04648-TOM7    Doc 288    Filed 03/06/14    Entered 03/06/14 13:41:53    Desc Main
Document    Page 41 of 46

B.R. 646, 655 (B.A.P. 6th Cir. 2008); Ng & Charming Trading Co. v. Adler (In re Adler), 494 B.R. 43, 75 (Bankr. E.D. N.Y. 2013).

The question then is whether the debtor's failure to list her insurance claim on her bankruptcy schedules was concealment. The generic question has been answered "yes" by numerous courts, including:

Kunce v. Kessler (In re Kessler), 51 B.R. 895, 898 (Bankr.D.Kan.1985). "The Court finds that the trustee has sustained his burden of proof in this case. The trustee Kunce established that the debtor concealed his checking account at United Missouri Bank by failing to list the account in the schedules of his individual petition or those of his corporation."

Cobb v. Hadley (In re Hadley ), 70 B.R. 51, 53 (Bankr. D. Kan. 1987) "The failure to list the property is strong evidence of concealment."

Hunter v. Sowers (In re Sowers), 229 B.R. 151, 157 (Bankr .N.D. Ohio 1998), "omitting information in a debtor's bankruptcy schedules may also constitute concealment occurring after the bankruptcy petition is filed for purposes of § 727(a)(2)(B)."

Cox v. Cox (In re Cox), A.P. No. 12-6017, 2013 WL 66282, *3 (Bankr. N.D. Ohio Jan 04, 2013) "Omitting information from bankruptcy schedules constitutes a concealment both before and after the filing of the bankruptcy petition."

Based on the above, the Court finds that the debtor's failure to list her necklace insurance claim on her bankruptcy schedules constitutes concealment for purposes of Element 1, thus Element 1 is satisfied.

### (2) Element 4 - Fraudulent Intent

The Court in Holmes explains:

The final element of § 727(a)(2)(B) requires that the plaintiff demonstrate fraudulent intent on the part of the defendant. As stated above, the fraud in question must be fraud in fact, not constructive fraud. See Sowers, 229 B.R. at 157. Courts have held that fraudulent intent can be found where the defendant demonstrates "reckless disregard or indifference for the truth." Heil, 289 B.R. at 908; see also Sayre, 321 B.R. at 427. The Court may deduce such behavior from the facts and circumstances of the case. A pattern of omissions on the part of the debtor is often sufficient to find fraudulent intent, but an innocent mistake or error will not suffice. See Keeney, 227 F.3d at 686; see also Heil, 289 B.R. at 908; Olsen v. Slocombe (In re Slocombe ), 344 B.R. 529, 536 (Bankr.W.D. Mich.2006).

Id. at *4

The court in In re Williamson, A.P. No. 12-06011, 2013 WL 441418 (Bankr. S.D. Ga. Feb 01, 2013) addressed the practical problem that arises in every review of this type. It wrote:

> "Since it is unlikely that a debtor will admit that [s]he intended to hinder, delay, or defraud a creditor, actual intent to do so may be established by circumstantial evidence or by inferences drawn from a course of conduct." Hines v. Marchetti, 436 B.R. at 165 (citing In re Jennings, 533 F.3d at 1339); see also In re Osterman, 296 F. App'x 900, 902 (11th Cir.2008) (citing In re Ingersoll, 124 B.R. 116, 121 (M.D.Fl.1991))("In order to find fraudulent intent, the court can consider circumstantial evidence or can infer it from the debtor's action."); In re Heraud, 410 B.R. 569, 578–79 (Bankr. E.D. Mich.2009) (quoting Hunter v. Sowers (In re Sowers), 229 B.R. 151, 157 (Bankr.N.D.Ohio 1998))("Just one wrongful act may be sufficient to show actual intent .... However, a continuing pattern of wrongful behavior is a stronger indication of actual intent.")

Id. at *3.

The court in Holmes explains again:

> An individual who files for bankruptcy has an affirmative duty to fully and honestly disclose all assets. Browning v. Levy, 283 F.3d 761, 775 (6th Cir.2002). The Fifth Circuit explained that full disclosure of assets by the debtor is critical to the operation of the bankruptcy system because such information, "permits the court, the trustee, and the creditors to evaluate the debtor's financial condition at the date of the bankruptcy and ascertain what assets may be available for distribution to creditors." Superior Crewboats, Inc. v. Primary P & I Underwriters (In re Superior Crewboats, Inc.), 374 F.3d 330, 333 (5th Cir.2004).

Id. at *6.

This debtor's reasons for not listing her necklace asset were: one, that the necklace was lost; and two, even though it was lost she was not going to file an insurance claim for that loss. While this Court sees some practical considerations for these reasons, it cannot excuse the debtor. The law required her to list the necklace or the insurance claim asset, especially given the value. Even if she, or her husband, was not aware of that requirement, her lawyer, if he was intent on practicing bankruptcy law,

43

knew it, or should have known it.[46]

One of the reasons the Court denied the debtor a discharge in her last case, Case No. 02-01867 was because it found that a "diamond necklace" was part of the, "material information [ the debtors omitted] from the bankruptcy schedules they filed [that case] on March 27, 2002." Memorandum Opinion at 73, A.P. 02-00209, A.P. Docket No. 33. As we know now, that diamond necklace was the same diamond necklace that is the subject of the current case and the object of the insurance asset the debtor should have listed, but did not, when she filed the current case.

In regard to the plaintiff's current section 727(a)(2)(B) count, the evidence established in the current case, in combination with the evidence established in the Court's review of the debtor's prior bankruptcy filings and associated nondischargeability adversary complaints, and the evidence this Court relied on in its prior memorandum opinions and orders, confirms a pattern.

As the court in Williamson, explained, courts should not expect debtors to confess to fraudulent intent, but as the courts in Holmes and Sowers explained, "A pattern of omissions on the part of the debtor is often sufficient to find fraudulent intent..." Holmes at *4, and "Just one wrongful act may be sufficient to show actual intent under § 727(a)(2). However, a continuing pattern of wrongful behavior is a stronger indication of actual intent." Sowers at 157.[47]

Did this Court's last order denying the debtor a discharge mean anything? How many times would the debtor, or her lawyer, not list the same necklace? What else could this Court have done to explain the consequences of the failure to list an asset in a bankruptcy case?

_____

[46] The debtor's current lawyer came to this case later and did not file the petition.

[47] The next lines in Sowers are:

Applying these standards to all of the statements and omissions occurring in the Defendants bankruptcy schedules and at the § 341 meeting, this Court is left with little doubt that the Defendants acted with the requisite intent to defraud the Trustee so as to constitute a violation of § 727(a)(2)(B). For example, there is virtually no possibility that the Defendants could have been unaware that they owned a 1963 Corvette, or that they had an ownership interest of a condominium in Florida. Nonetheless, these items of property were omitted from the Defendants' bankruptcy schedules and no information as to their existence was provided to the Trustee at the § 341 meeting.

Id.

44

This Court agrees with the opinion in In re Brooks, 278 B.R. 563 (Bankr. M.D. Fla. Feb 19, 2002) which includes:

> A debtor who comes to the bankruptcy court must come clean and make full disclosure of all information relevant to the administration and must fully cooperate with the trustee. Kentile Floors, Inc. v. Winham, 440 F.2d 1128 (9th Cir.1971); In the Matter of Garman, 643 F.2d 1252 (7th Cir.1980). **It is not for the debtor to decide what is and is not relevant. A debtor who omits important information and fails to make full disclosure, place the right to the discharge in serious jeopardy**.

Id. at 566 (emphasis added).

### 2. Conclusions to the Plaintiffs' Section 727(a)(2)(B) Count

Based on the above, the Court finds that the plaintiffs satisfied all four elements required to prove a section 727(a)(2)(B) allegation. Consequently, the Court finds that the debtor's discharge is due to be denied pursuant to section 727(a)(2)(B).

### V. Conclusions

Based on the above, the Court concludes that:

1.  Upon final review:

    a.  The Court's March 24, 2009, Memorandum Opinion and Order Denying the Plaintiffs' Motion for Summary Judgment, (A.P. Docket Nos. 30 and 31), denying the plaintiffs' Motion for Summary Judgment, A.P. Docket No. 9) is **Confirmed** and will be made final by a separate order;

    b.  The Court's September 10, 2009, Order (A.P. Docket No. 42) denying the Anglins' Motion to Alter, Amend, or Vacate the Court's Order of March 25, 2009 [sic] A.P. Docket No. 35, is **Confirmed** and will be made final by a separate order;

    c.  The Court's March 5, 2012, Memorandum Opinion and Order (A.P. Docket Nos. 104 and 105) denying: (1) the defendant's Motion to Dismiss or in the Alternative Motion for Summary Judgment, Docket No. 34; (2) the Defendant's Renewed Motion to Dismiss or Grant Summary Judgment and Brief Defendant's Position on Court Meeting Scheduled for October 19, 2011, A.P. Docket No. 86, (a substitution for A.P. Docket No. 34); and the defendant's Motion for Summary Judgment, A.P. Docket No. 92, are **Confirmed** and will be made final by a separate order;

45

      d.     The Court's March 5, 2012, <u>Memorandum Opinion</u> and <u>Order</u> (A.P. Docket Nos. 104 and 105) granting the plaintiffs' <u>Motion to Amend Complaint</u>, A.P. Docket No. 95, is **Confirmed** and will be made final by a separate order;

2.     The plaintiffs proved that the debtor's discharge is due to be denied pursuant to section 727(a)(2)(B), and that discharge will be denied by separate order.

Dated: March 6, 2013        /s/Benjamin Cohen
                                      BENJAMIN COHEN
                                        United States Bankruptcy Judge

BC:pb